IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MATTHEW WATSON, | ) | Case No. 1:18-cv-0174 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| v. | ) | |
| | ) | |
| COMMISSIONER OF | ) | **MEMORANDUM OF OPINION** |
| SOCIAL SECURITY, | ) | **AND ORDER** |
| | ) | |
| Defendant. | ) | |

**I.     Introduction**

Plaintiff, Matthew Watson, seeks judicial review of the final decision of the Commissioner of Social Security denying his application for supplemental security income benefits under Title XVI of the Social Security Act. The parties consented to my jurisdiction. ECF Doc. 12. Because substantial evidence supported the ALJ's decision and because Watson has not identified any incorrect application of legal standards, the final decision of the Commissioner must be AFFIRMED.

**II.    Procedural History**

Matthew Watson protectively applied for supplemental security income on April 1, 2014. (Tr. 153-158). He alleged a disability onset date of May 1, 2007. (Tr. 153). His application was denied initially on July 23, 2014 (Tr. 104) and after reconsideration on October 21, 2014. (Tr. 113). Watson requested an administrative hearing (Tr. 115), and Administrative Law Judge ("ALJ") Scott R. Canfield heard the case on May 3, 2016. (Tr. 26-66). The ALJ found that

Watson was not disabled in a June 30, 2016 decision. (Tr. 8-21). On December 5, 2017, the Appeals Council denied Watson's request for further review, rendering the ALJ's conclusion the final decision of the Commissioner. (Tr. 1-4). On January 23, 2018 Watson filed this action to challenge the Commissioner's final decision. ECF Doc. 1.

## III. Evidence

### A. Relevant Medical Evidence

Watson was born on July 29, 1989 and was almost 27 years old at the time of the administrative hearing. (Tr. 34, 153). School records reported diagnoses of oppositional defiance disorder, personality disorder, and morbid obesity. (Tr. 238). He was in special education classes while in school. When he was 17, Strongsville City Schools conducted a three-year re-evaluation. (Tr. 252). The team report concluded that Watson was disabled due to emotional disturbance. He continued to exhibit an inability to build and maintain satisfactory interpersonal relationships with peers and teachers. He expressed inappropriate types of behaviors or feelings under normal circumstances and had a general mood of unhappiness or depression. (Tr. 269). A 2008 Individual Service Plan noted that Watson was going to partial hospitalization five times a week; and he received community support services twice a week. There were safety concerns related to Watson's history of physical and verbal aggression. Due to "high levels of aggression and safety concerns", the ISP stated that Watson could be restrained using standard TCI standing restraint procedures. (Tr. 247).

Dr. David J. Mansour's treatment notes from April 15, 2011 stated that Watson's diagnoses included morbid obesity and major depressive disorder. (Tr. 288). Watson weighed 218 pounds. (Tr. 293). On May 13, 2011, Dr. Mansour noted that Watson was smoking 2-3 cigarettes a day. (Tr. 290).

2

Watson began treating with Alan Wiggers, D.O., for a thyroid problem in May 2012. (Tr. 319, 324). Watson weighed 493 at his first appointment. (Tr. 319). By March 2013, Watson had gained 45 pounds. (Tr. 322). Dr. Wiggers referred him to bariatric surgery and recommended that he stop smoking. (Tr. 323).

Watson had a bariatric surgery evaluation at University Hospital on May 9, 2013. Watson weighed 536.4 pounds with a body mass index ("BMI") of 79.2. Co-morbidities included depression, abdominal pannus, high blood pressure, joint and muscle pain and swelling in the legs and feet. Watson's weight was too high for surgery. He was advised he'd need to reduce his BMI to 70 before he could have bariatric surgery. (Tr. 448-449).

Watson underwent a sleep study on June 10, 2013 and was diagnosed with sleep apnea/ sleep related breathing disorder, unspecified, severe. (Tr. 445-447). Watson was given a CPAP machine. (Tr. 306).

Watson returned to the outpatient surgery clinic on June 27, 2013 after seeing a dietician and attending a weight loss class. He weighed 525 pounds – a weight loss of 10.6 pounds since his last visit. (Tr. 444).

On October 18, 2013, Watson reported to Dr. Wiggers that he was exercising three times a week and had lost 20 pounds. (Tr. 317). Watson weighed 510 pounds. He was advised to continue working with the bariatric clinic. (Tr. 318-319).

Watson returned to the outpatient surgery clinic on September 11, 2014. He reported having a difficult time recently due to stress. He weighed 505 pounds and his BMI was 74.78. (Tr. 441). On December 11, 2014, Watson reported he had been doing better due to a support group he was building. However, his life was stressful because of his mother's debilitation. He was trying to avoid emotional eating. (Tr. 438).

In January 2015, Watson reported that he had eaten a "copious amount of sweets and desserts" over the holidays. He weighed 503 lbs. His stress levels had decreased, and his mother was doing much better. He reported increased activity with household chores such as taking three or four trips up and down the stairs to take out the trash, helping his neighbors decorate and shopping for his family and neighbors. (Tr. 435). The dietitian recommended that Watson try a liquid diet to jumpstart his weight loss. (Tr. 436). In February 2015, Watson told the dietitian he was working on a new resume, so he could get back to work. (Tr. 430). He also told her that he was planning to go to the gym with his girlfriend after he recovered from the flu. (Tr. 431).

Watson saw Dr. Wiggers on June 8, 2015. He thought he was eating healthy but was not counting calories. He weighed 516 pounds and his BMI was 76.2. (Tr. 424). Dr. Wiggers referred Watson back to the weight loss clinic. (Tr. 425).

**B.    Opinion Evidence**

    **1.    Treating Physician – Alan Wiggers – March 2016**

Dr. Wiggers completed a medical source statement on March 22, 2016. (Tr. 500-502). Dr. Wiggers had been treating Watson two times a year for the prior three years. Dr. Wiggers reported that Watson had symptoms of easy fatigue and dyspnea with exertion. (Tr. 500). Dr. Wiggers opined that Watson was capable of standing and/or walking for ten minutes without interruption. He opined that he could sit for an hour without interruption. He also opined that Watson would need to take 10-minute breaks every 30 minutes and would be off-task 10-15% of the day. (Tr. 501). Dr. Wiggers further opined that Watson would be absent from the work force because of fatigue 10 times per month. (Tr. 502).

4

### 2.     Consultative Examination – Dr. Hasan Assaf, M.D. – June 2014

Consultant Dr. Hasan Assaf examined Watson on June 18, 2014. (Tr. 336-340). Watson reported having headaches two to three times per week. He also reported low back pain, knee pain and ankle pain. He took over-the-counter pain relievers. Watson said he cooked once or twice a week and cleaned three times a month. He did laundry once a week. (Tr. 337). Watson reported watching television, listening to the radio, reading, socializing with friends, and watching movies. (Tr. 338). Examination showed a normal gait and stance with no assistive device. Watson could squat to 70 degrees and rise from a chair without difficulty. (Tr. 338). He had negative straight leg raises and normal range of motion with slightly decreased lumbar and hip flexion. (Tr. 343). Watson had full strength and no sensory deficits. (Tr. 339, 342). X-rays of his lumbar spine were normal, but a lateral view could not be obtained due to Watson's size. (Tr. 339, 341, 503, 507). Dr. Assaf diagnosed morbid obesity, hypertension, hypothyroidism, lower back pain, bilateral knee and ankle pain, sleep apnea, ADHD, ADD, and oppositional defiant disorder. (Tr. 339-340). He opined that Watson had mild limitations in activities requiring prolonged standing, walking, bending and lifting. (Tr. 340).

### 3.     Consultative Examination – Charles F. Misja, Ph.D., - June 2014

Consultant Charles Misja, Ph.D., conducted a psychological examination on June 20, 2014. (Tr. 347). Watson told Dr. Misja that he had applied for Social Security benefits five or six times. (Tr. 348). He reported a history of mental health issues as a child. (Tr. 348-349). Watson reported attending church regularly, but that most of his social contact was through his phone. (Tr. 350). He watched movies on his computer and listened to music. He swam at his apartment pool and did his own laundry. (Tr. 350). Mental status examination showed appropriate grooming, good eye contact, and unremarkable speech. Watson had a constricted

affect and depressed but stable mood. He reported occasional suicidal ideation and feelings of hopelessness, inadequacy, worthlessness and shame. (Tr. 350). Watson reported occasional anxiety but had no visible signs of anxiety during the interview. He was able to recall two out of three words after a five-minute interval. Dr. Misja opined that Watson's insight and judgment were poor. (Tr. 351). Dr. Misja diagnosed major depression, moderate, personality disorder, NOS, with mixed features, and assigned a GAF score of 50. (Tr. 352). Dr. Misja reported that Watson presented as depressed and with a certain edge that strongly suggested a personality disorder. He opined that the many years of teasing and bullying he experienced "have a present reality for him and in the best-case scenario he goes to counseling and benefits." (Tr. 352). Dr. Misja opined that Watson should be able to understand and implement ordinary instructions. He would have minimal to intermediate problems in his ability to maintain attention, concentration, persistence and pace. He would likely have intermediate problems in his ability to respond appropriately to supervision and coworkers in a work setting and intermediate problems in his ability to respond appropriately to work pressures in a work setting. (Tr. 353).

### 4. State Agency Reviewing Physicians

Ann Prosperi, D.O., reviewed medical records related to Watson's physical conditions on July 14, 2014. She opined that he would be capable of lifting 20 pounds occasionally, 10 pounds frequently, that he could stand and/or walk for 4 hours in an 8-hour workday and could sit for 6 hours in an 8-hour workday. He could occasionally climb ramps/stairs, stoop, kneel, crouch and crawl; he could frequently balance, but could never use ladders, ropes or scaffolds. (Tr. 79). She opined that Watson should not be exposed to hazards such as machinery and heights. (Tr. 80). Abraham Mikalof, M.D., reviewed Watson's files on October 9, 2014 and agreed with all but

one of Dr. Prosperi's opinions. It was his view that Watson could never crawl, rather than could occasionally do so. (Tr. 97-99).

Leslie Rudy, Ph.D., reviewed Watson's mental health records on July 22, 2014. Dr. Rudy found that there was evidence of an affective disorder and a personality disorder resulting in mild restrictions of activities of daily living; moderate difficulties maintaining social functioning; and moderate difficulties maintaining concentration, persistence and pace. (Tr. 76-77). Dr. Rudy also opined that Watson should be limited to a job without a fast pace or high production. Watson was able to interact on an occasional and superficial basis. He could adapt to occasional changes with some supervisory support. (Tr. 82). Tonnie Hoyle, Psy.D., reviewed Watson's mental health chart on October 18, 2014 and agreed with most of Dr. Rudy's opinions. Dr. Hoyle opined that Watson would be capable of simple tasks and occasional detailed three-to-four step tasks. (Tr. 99). Dr. Hoyle agreed that Watson was able to interact on an occasional and superficial basis. (Tr. 100). Dr. Hoyle opined that Watson was able to adapt to occasional changes with some supervisory support. Dr. Hoyle further opined that Watson should be limited to low stress, low production work in a relaxed setting with minimal routine changes. (Tr. 101).

    **C.**    **Relevant Testimonial Evidence**

        **1.**    **Watson's Testimony**

Watson testified at the hearing. (Tr. 31-55). He was almost 27 years old. (Tr. 34). He lived in his mother's house with her, her friend, and his father who had recently moved back in with them. (Tr. 31-32). Watson was 5'10". At the time of the hearing, he weighed 538 or 539 pounds. (Tr. 32). Watson had a high school education. He received special education but not in a separate classroom; he had a different curriculum than other children at school. (Tr. 38-39).

Watson never tried to get a driver's license because he could not fit behind the wheel of a car. (Tr. 38).

When Watson turned 26, he was taken off of his mother's insurance. Before he lost his insurance, he was hoping to have bariatric surgery. But, he had to get his own insurance and had gained weight. His weight had increased to over 550 pounds. He was looking for a new program to help him lose weight. (Tr. 34).

Watson worked at KFC for one day and quit because it was difficult for him to move around the kitchen. (Tr. 35). He worked at Circle K for about a week and quit because the person training him was not doing her job. (Tr. 35-36). He worked at Marco's making pizzas for almost six months. (Tr. 36). He was let go from that job because he was not able to keep up with the work. (Tr. 37).

In addition to obesity, Watson had low back pain every day and problems with his knees. He took over the counter medications for pain. (Tr. 40-41). He also used a CPAP machine for sleep apnea. (Tr. 43). Watson was diagnosed with hypothyroidism and hypertension and controlled both of those conditions with medications. (Tr. 44).

Watson took medication for psychological issues before he turned 18. He no longer took them because they made him feel like he was in a fog all the time. (Tr. 45). When he got upset, he talked to his mom for support. Sometimes it was difficult for him to concentrate. (Tr. 46).

Watson estimated that he could sit for two hours at a time before he needed to walk around for five to ten minutes in order to regain feeling in his legs. (Tr. 49). He could sit in a recliner for five to six hours. (Tr. 52). He could walk for about ten minutes but then would need to sit down for 20-30 minutes. (Tr. 51-52). Watson took a two to four hour nap every day. He also slept long hours at night. (Tr. 50-51).

### 2. Testimony of Brett Salkin, Vocational Expert

Vocational Expert ("VE") Brett Salkin also testified at the hearing. (Tr. 55-63). Watson had not worked long enough to have past relevant work experience. The VE testified that no jobs would be available for an individual with Watson's vocational profile who was limited to light or sedentary work, except he could stand and/or walk for four hours of an eight hour work day; he could never climb ladders, ropes, or scaffolds or crawl; he could occasionally climb ramps, stairs, balance, stoop, kneel and crouch; he must avoid concentrated exposure to fumes, odors, dusts, gases, and poorly ventilated areas, and all hazards such as dangerous and unprotected heights; he was limited to simple routine tasks with no strict time demand or strict production quotas with only simple work instructions and decisions and no more than minimal or infrequent changes in the work setting; and he was limited to occasional interaction with the public, coworkers and supervisors. (Tr. 56-57). However, if this individual were capable of frequent interaction with the public, coworkers and supervisors, he could perform the jobs of information clerk at the light exertional level and, at the sedentary level, food and beverage order clerk, charge account clerk, and telephone clerk. A significant number of these jobs existed in the national economy. (Tr. 58-59).

## IV. The ALJ's Decision

The ALJ's June 30, 2016 decision made the following findings relevant to this appeal:

2. Watson had the following severe impairments: morbid obesity, depressive disorder, and personality disorder. (Tr. 13).

4. Watson had the residual functional capacity to perform light work, * * * except he could stand and/or walk for four hours in an eight-hour workday; he could never climb ladders, ropes or scaffolds; he could never crawl; he could occasionally climb ramps or stairs, balance, stoop, kneel, and crouch; he was required to avoid concentrated exposure to fumes, odors, dusts, gases and poorly ventilated areas; and he needed to avoid all exposure to hazards such as dangerous machinery and unprotected heights. Watson was also limited to

9

> simple, routine tasks with no strict time demands, no strict production quotas, only simple work instructions and decisions, and no more than minimal or infrequent changes in the work setting. He was limited to frequent interaction with the public, coworkers, and supervisors. (Tr. 15).
>
> 9. Considering Watson's age, education, work experience and residual functional capacity, there were jobs existing in significant numbers in the national economy that he could perform. (Tr. 19).

Based on his findings, the ALJ determined Watson had not been under a disability since April 11, 2014, the date his application was filed. (Tr. 20).

## V.     Law & Analysis

### A.     Standard of Review

This court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence has been defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994).

The Act provides that "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §§ 405(g) and 1383(c)(3). The findings of the Commissioner may not be reversed just because the record contains substantial evidence to support a different conclusion. *Buxton v. Halter,* 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen,* 800 F.2d 535,545 (6th Cir. 1986); see also *Her v. Comm'r of Soc. Sec.*, 203 F.3d 288, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the

evidence could reasonably support the conclusion reached." See *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997). This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without risking being second-guessed by a court. *Mullen,* 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984).

The court also must determine whether the ALJ decided the case using the correct legal standards. If not, reversal is required unless the legal error was harmless. *See e.g. White v. Comm'r of Soc. Sec*. 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [when] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue,* 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996); accord *Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue*, No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue,* No. 1:09-cv-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010). Requiring an accurate and logical bridge ensures that a claimant will understand the ALJ's reasoning.

In considering a Social Security benefits application, the Social Security Administration must follow a five step sequential analysis: at Step 1, the Commissioner asks if the claimant is

still performing substantial gainful activity; at Step 2, the Commissioner determines if one or more of the claimant's impairments are "severe;" at Step 3, the Commissioner analyzes whether the claimant's impairments, singly or in combination, meet or equal a Listing in the Listing of Impairments; at Step 4, the Commissioner determines whether the claimant can still perform his past relevant work; and finally, at Step 5, if it is established that claimant can no longer perform her past relevant work, the burden of proof shifts to the agency to determine whether a significant number of other jobs which the claimant can perform exist in the national economy. *See Combs v. Comm'r of Soc. Sec.,* 459 F.3d 640, 643 (6th Cir. 2006); 20 C.F.R. §§404.1520, 416.920. A plaintiff bears the ultimate burden to prove by sufficient evidence that he is entitled to disability benefits. 20 C.F.R. §404.1512(a).

### B. Treating Physician Rule

Watson contends that the ALJ failed to provide good reasons for assigning less than controlling weight to the opinion of his treating physician, Dr. Wiggers. He also argues that the ALJ failed to take his extreme obesity into account when considering Dr. Wiggers' opinion. The administrative regulations implementing the Social Security Act impose standards for weighing medical source evidence. *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011). In making disability determinations, an ALJ must evaluate the opinions of medical sources in accordance with the nature of the work performed by the source. *Gayheart v. Comm'r of Soc. Sec.,* 710 F.3d 365, 375 (6th Cir. 2013). The treating physician rule requires that "[a]n ALJ [] give the opinion of a treating source controlling weight if he finds the opinion well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other

substantial evidence in [the] case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(c)(2)[1]) (internal quotation marks omitted).

Even if the ALJ does not give the opinion controlling weight, the treating source opinion is still entitled to significant deference or weight that takes into account the length of the treatment and frequency of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and whether the treating physician is a specialist. 20 C.F.R. § 416.927(c)(2)-(6). The ALJ is not required to explain how he considered each of these factors but must provide "good reasons" for discounting a treating physician's opinion. 20 C.F.R. § 416.927(c)(2); see also *Cole*, 661 F.3d at 938. ("In addition to balancing the factors to determine what weight to give a treating source opinion denied controlling weight, the agency specifically requires the ALJ to give good reasons for the weight actually assigned.")

The ALJ's "good reasons" must be "supported by the evidence in the case record and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Gayheart*, 710 F.3d at 376 (quoting Soc. Sec. Rul. No. 96-2p, 1996 SSR LEXIS 9, *12, 1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996)). As the Sixth Circuit has noted,

> [t]he conflicting substantial evidence must consist of more than the medical opinions of the nontreating and nonexamining doctors. Otherwise the treating physician rule would have no practical force because the treating source's opinion would have controlling weight only when the other sources agreed with that opinion. Such a rule would turn on its head the regulation's presumption of giving greater weight to the treating sources because the weight of such sources would hinge on their consistency with nontreating, nonexamining sources.

*Id.* at 377.

---

[1] The regulation applicable to SSI claims, 20 C.F.R. § 416.927, is identical to the regulation cited in *Wilson*.

13

A failure to follow these procedural requirements "denotes a lack of substantial evidence, even [when] the conclusion of the ALJ may be justified based on the record." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 243 (6th Cir. 2007). The Sixth Circuit Court of Appeals "do[es] not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and [it] will continue remanding when [it] encounter[s] opinions from ALJs that do not comprehensively set forth reasons for the weight assigned." *Cole*, 661 F.3d at 939 (quoting *Hensley v. Astrue*, 573 F.3d 263, 267 (6th Cir. 2009)) (alteration in original) (internal quotation marks omitted).

> Regarding Dr. Wiggers' opinions on Watson's physical capacity, the ALJ stated:
>
> The undersigned gives little weight to this opinion, as the medical evidence of record, including Dr. Wiggers' own records, do not support such extreme limitations. For example, the medical evidence of record indicates that the claimant consistently exhibited normal gait, normal strength, and normal range of motion (7F/4, 8; 10F/2, 4, 11; 11F/4, 11; 12 F/8). Additionally, Dr. Wiggers consistently noted that the claimant reported no arthralgias, no myalgia, no back pain, no joint swelling, no joint stiffness, no limb pain, and no limb swelling (10F/1, 10; 11F/4, 10). Finally, the claimant testified that he was able to lift up to twenty pounds, which is significantly more than that opined by Dr. Wiggers (Hearing).

(Tr. 19).

The ALJ's reason for assigning limited weight to the opinion of Dr. Wiggers was that the record did not support his "extreme" opinions. After making this finding, the ALJ was then required to point to "evidence in the case record, *** sufficiently specific to make clear to any subsequent reviewers the weight he gave to the treating source's medical opinion and the reasons for that weight." *Gayheart*, 710 F.3d at 376 (quoting Soc. Sec. Rul. No. 96-2p, 1996 SSR LEXIS 9, *12, 1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996)). And he did. The ALJ cited records from multiple sources showing that Watson's gait was normal (Tr. 338, 425, 460), he had normal muscle strength (Tr. 342), and he had normal range of motion. (Tr. 468). Dr.

14

Wiggers' own notes stated that Watson had no back pain or joint swelling or stiffness. (Tr. 424). The ALJ also contrasted Dr. Wiggers' opinion that Watson could never lift ten pounds with Watson's own testimony that he could probably lift 20 pounds. (Tr. 43).

Watson argues that the ALJ failed to consider his obesity when evaluating the opinion of Dr. Wiggers. But the ALJ did consider Watson's obesity, even noting that it was his greatest impairment. The ALJ recognized that Watson's BMI was consistently more than 70 and that Watson was morbidly obese. (Tr. 16). The ALJ stated that he was "aware that obesity is a risk factor that increases an individual's chances of developing impairments in most body symptoms" and that he had "considered any added or accumulative effects the claimant's obesity plays on his ability to function, as well as his ability to perform routine movement and necessary physical activity within the work environment." (Tr. 16-17). His analysis was consistent with SSR 02-01p which provides, in part, that "[t]he fact that obesity is a risk factor for other impairments does not mean that individuals with obesity *necessarily* have any of these impairments." Id. (Emphasis added).

The substantial evidence standard presupposes a "zone of choice," within which the ALJ may decide a case without interference from the courts. *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006). Even if a reviewing court might resolve factual issues differently, when supported by substantial evidence, the Commissioner's decision must stand. See *Foster v. Halter*, 279 F.3d 348, 353 (6th Cir. 2001). The ALJ did not err by failing to provide good reasons for discounting the opinions of Watson's doctor; he cited specific evidence supporting his decision to assign limited weight to Dr. Wiggers' opinion.

The ALJ assigned partial weight to Dr. Wiggers' opinion because his opinion was inconsistent with the medical records and with Watson's own testimony. The ALJ's decision

was within a "zone of choice," open to the Commissioner which was supported by the record. He provided good reasons for assigning less than controlling weight to Dr. Wiggers' opinion. Because the ALJ neither erred by assigning less than controlling weight to the Dr. Wiggers' opinion nor by providing insufficient reasons for his decision, Watson's argument lacks merit.

### C. Residual Functional Capacity

Watson also argues that the ALJ erred by finding him capable of frequent interaction with the public, coworkers, and supervisors. Watson contends that all three medical providers who considered Watson's mental limitations opined that he should be limited to occasional and superficial interaction. (Tr. 82, 100, 353). Watson argues that no substantial evidence supported the ALJ's finding that he was capable of frequent interaction with the public, coworkers, and supervisors. But, in his decision, the ALJ stated:

> In social functioning, the claimant has mild difficulties. The claimant reports that he has no problem getting along with family, friends, neighbors and others. He further reported that he attends church and talks on the phone or computer with friends. In the function report, he stated that he gets along fine with authority figures; however, at the hearing, he testified that he has problems getting along with bosses and authority figures. He further testified that he tries to ignore people when he goes out. (Hearing; 4E). The claimant's treating providers consistently reported that he exhibited a normal, cooperative, and appropriate mood and affect (10F/2, 3; 12F/8). Accordingly, the undersigned finds no more than mild restrictions.

(Tr. 14). The ALJ assigned only some weight to the state agency psychological reviewers' opinions, and he found that Watson was not as restricted socially as opined. The ALJ cited the following evidence to support this finding:

> For example, the record indicates that the claimant has begun doing more around the house for both his family and neighbors. This includes taking out the trash for everyone, helping neighbors put up and take down decorations, and doing the shopping (10F/12). Further, the record indicates that the claimant is able to go to the gym with his girlfriend (10E/9; 15F/2). Additionally, the claimant was able to work at Marco's pizza for six months (Testimony). Finally, the claimant interacted well with his counsel and the undersigned throughout the hearing.

16

> Accordingly, the undersigned finds that the claimant is able to frequently interact with the public, coworkers, and supervisors.

(Tr. 18). Similarly, when the ALJ considered the opinion of the consultative examiner, Dr. Misja, the he assigned some weight to the opinion but found that the evidence of record supported a less restrictive social limitation, as already discussed in his decision. (Tr. 18)

None of the medical opinions related to Watson's ability to interact with supervisors and co-workers was from a treating source. Accordingly, the ALJ was not required to assign controlling weight to these opinions nor to provide "good reasons" for assigning them less weight. *Gayheart v. Comm'r of Soc. Sec.,* 710 F.3d 365, 376 (6th Cir. 2013). Nonetheless, the ALJ did explain his reasons for assigning limited weight to the opinions and cited evidence from the record in support of his decision.

Watson argues that there is a difference between socializing with his neighbors and girlfriend and interacting with supervisors and co-workers in a pressurized work setting. Had that been the only evidence cited by the ALJ, his decision probably would have lacked the support of substantial evidence. However, earlier in his decision, the ALJ referred to Watson's own adult functioning report in which he indicated that he got along "fine" with authority figures. And Watson did not report any problems with authorities or co-workers at Marco's Pizza, where he had worked for almost six months. He lost that job because he could not keep up with the pace of the other employees. (Tr. 37)

The RFC is an administrative finding reserved to the Commissioner based on his evaluation of the totality of the record evidence. *See Shepard v. Comm'r of Soc. Sec.,* 705 F. App'x. 435, 442 (6th Cir. 2017), citing *Rudd v. Comm'r of Soc. Sec.,* 531 F. App'x 719, 728 (6th Cir. 2013). The ALJ's decision regarding Watson's ability to interact with supervisors and co-workers is a matter within the ALJ's "zone of choice." Even if this court might resolve this

17

factual issue differently, the Commissioner's decision must stand because it was supported by substantial evidence in the record, which the ALJ cited in his decision. See *Foster v. Halter*, 279 F.3d 348, 353 (6th Cir. 2001).

> **D. Was the ALJ Required to Include a Special Chair Accommodation in his RFC Determination?**

Watson argues that the ALJ did not take into account that he would need a special chair to accommodate his 500-pound frame. Because the ALJ did not include this accommodation in his questions to the VE or in his RFC determination, Watson argues that the record does not support the ALJ's finding that there are a significant number of jobs that he could perform in the national economy. ECF Doc. 13 at Page ID# 593.

Watson's attorney asked the VE a hypothetical question based on an individual that required a special chair to accommodate a 500-pound frame. (Tr. 63). The VE acknowledged that a special chair would be an accommodation by an employer. But Watson's attorney did not follow up regarding the special chair. The ALJ limited Watson's RFC to four hours of sitting but did not include a special chair accommodation. Other than his own testimony that he would have a hard time sitting in certain chairs, Watson has produced no evidence supporting his alleged need for a special chair. (*Id.*, Tr. 48). Thus, Watson's argument that the VE's testimony did not support a finding that a significant number of jobs existed for an individual who required a special chair is irrelevant. *See Salyer v. Comm'r of Soc. Sec.,* 574 F. App'x 595, 596 (6th Cir. 2014). ("Regarding the first contention, though the VE testified that Salyer's job prospects would diminish if certain hypothetical conditions applied, that testimony lacks relevance because in fact the ALJ found that none of those conditions applied.)

Because substantial evidence supported the ALJ's RFC determination and because Watson has not identified any incorrect application of legal standards in the ALJ's questioning of

18

the VE or in his determination that a significant number of jobs existed in the national economy, the ALJ's RFC determination must be affirmed.

## VI.     Conclusion

The ALJ properly analyzed the evidence, including that of Watson's medical sources, and concluded that he was not disabled during the relevant time period. Because substantial evidence supports the ALJ's decision and because Watson has not identified any misapplication of legal standards, the final decision of the Commissioner is AFFIRMED.

IT IS SO ORDERED.

Dated: December 6, 2018

Thomas M. Parker
United States Magistrate Judge